**In re Appeal of SHEAFFER; Sheaffer, Appellant; Ohio Department of Commerce, Division of Real Estate, Appellee.**

[Cite as *In re Appeal of Sheaffer* (1996), 116 Ohio App.3d 98.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 15879.

Decided Nov. 29, 1996.

*Izenson, Fuchsman & Brinkman* and *David H. Fuchsman,* for appellant.

*Betty D. Montgomery,* Attorney General, and *Barry D. McKew,* Assistant Attorney General, for appellee.

FREDERICK N. YOUNG, Judge.

On July 7, 1994, Dr. Guozhen Lu ("Lu") and Meiling Gao ("Gao") entered into a contract to purchase the residence of Mr. and Mrs. William H. Wentz. The home is located at 3834 Westwind Drive, Beavercreek, Ohio. Kenneth Strahler ("Strahler") was the real estate agent representing the buyers, Lu and Gao, in this transaction. Strahler works as an agent for Majestic Investment Real Estate, Inc. ("Majestic"). Gary N. Sheaffer is the supervising broker at Majestic.

Lu and Gao transferred $2,000 earnest money to Strahler pursuant to their contract to purchase agreement. Strahler properly placed the earnest money into one of Majestic's noninterest-bearing trust accounts. The money remained in this trust account throughout the entire transaction.

Lu and Gao contracted to purchase the residence for $217,500. The contract itself was a form agreement drafted by the Dayton Board of Realtors. In addition to the primary agreement, the parties agreed to a conventional inspection addendum that was likewise drafted by the Dayton Board of Realtors. The addendum provided that the purchaser had the right—at the purchaser's own expense—to obtain inspections of the residence. The addendum further provided

that if the inspections disclosed any defects in the property, the seller had a right to either repair the defect in a good and workmanlike manner using contractors reasonably acceptable to the purchaser or provide assurances reasonably acceptable to the purchaser that the defects would be repaired with due diligence and in a good and workmanlike manner. If the seller was unwilling or unable to perform either of the aforementioned actions, the purchaser had the option to cancel the contract. In the event the purchaser chose to cancel the contract, the addendum provided that "the earnest money *shall* be returned to Purchaser and the parties shall be released from all further obligations under this Contract." (Emphasis added.)

The addendum called for, among others, a radon inspection. The radon inspection report disclosed that the home had unacceptably high levels of radon. Lu and Gao sent away for information on radon. The information placed the national average for radon inside a home at 1.3 picocurie/liter level ("pc/I"). The radon level in the Wentzes' home was somewhere between 7 and 9 pc/I. Lu and Gao disclosed the defect to the Wentzes and informed them that they wanted repairs to be performed on the home to reduce the radon level to the national average of 1.3 pc/I.

The Wentzes contacted the Ohio EPA and were purportedly told that a reading of 4 pc/I was an acceptable level in a home. The Wentzes also claim that they were told that a level of 1.3 pc/I was impossible to achieve. The Wentzes relayed this information to Lu and Gao and offered to repair the home to decrease the radon level to 4 pc/I. The estimated cost of the repairs to lower the home's radon level to 4 pc/I was $700.

Lu and Gao investigated whether a level of 1.3 pc/I was unattainable. They discovered that several reputable companies guaranteed levels of radon under 2 pc/I. One company in particular was certified under the Radon Proficiency Testing Program, and its testers were licensed by the state of Ohio. That company estimated the cost of repairing the Wentzes' home to lower the pc/I level to under 2 would be $1,240. Lu and Gao determined that they needed the radon level to at least be reduced to 2 pc/I. Therefore, Lu and Gao rejected the Wentzes' offer to reduce the radon level to 4 pc/I and informed them that repairs to lower the radon level to 2 pc/I would be necessary.

The parties then reached an impasse. The Wentzes refused to pay the extra $540 to decrease the home's radon level to 2 pc/I and Lu and Mao likewise refused to change their position. Strahler attempted to mediate their differences to no avail. Strahler did not want to see the transaction fall through because of $540. Therefore, Strahler arranged a meeting with the Wentzes' real estate agent, Leslie Draeger ("Draeger"), and offered to reduce his commission to

absorb half of the $540 if she would do likewise. According to Strahler, Draeger refused to do so.

As a final attempt to save the agreement, Strahler spoke with his supervisor, Sheaffer. Sheaffer told Strahler that he would try to mediate the parties' differences. To do so, Sheaffer set up a meeting with the parties. Lu and Gao attended the meeting along with Draeger and Mrs. Wentz. According to Sheaffer, Lu refused to sit in the same room with Draeger and Mrs. Wentz because he felt that their reticence to decrease the pc/I levels to 2 was attributable to racism. Lu and Gao are Chinese and Sheaffer testified that they believed that Draeger and the Wentzes were discriminating against them. According to Sheaffer, Draeger had made racist remarks in referring to Chinese individuals.

Sheaffer acted as the mediator and go-between for the parties, but was unable to reach a compromise. Lu threatened to cancel the contract if the Wentzes did not agree to reduce the radon level to 2 pc/I. Sheaffer informed Draeger of Lu's position, yet she maintained that the Wentzes were unwilling to agree to reduce the level to 2 pc/I. When Sheaffer informed Lu that the Wentzes were firm in their stance, Lu canceled the contract according to the above-mentioned addendum provision. Lu then impatiently demanded the immediate return of his earnest money. Lu declared that he was entitled to the immediate return of his money according to the failure-to-repair cancellation provision in the addendum, which stated that in the event the purchaser cancels the contract, "the earnest money *shall* be returned to the *Purchaser.*" (Emphasis added.)

Sheaffer returned to the room where Draeger and Mrs. Wentz were waiting and told them that Lu had canceled the contract according to the inspection addendum. Furthermore, Sheaffer told them that Lu had asserted a right to the earnest money under the failure-to-repair cancellation provision and had demanded the immediate return of the earnest money. Sheaffer also told Mrs. Wentz that according to that provision, he had an obligation to return the money to Lu, and then presented Mrs. Wentz with a release form that stated that the contract was canceled and that the earnest money was to be returned to the purchasers. Neither Draeger nor Mrs. Wentz voiced any objection to the return of the earnest money or to the meaning or application of that provision at that time. Mrs. Wentz testified that she believed that she was objecting to the return of the earnest money by not signing the release form.

The meeting took place on a weekend, and on the following Monday, Sheaffer returned the earnest money to Lu. About a week and a half after Sheaffer returned the earnest money, Sheaffer received a letter from the Wentzes' attorney. Their attorney stated that Lu and Mao were in default and that the Wentzes were entitled to the $2,000 held in escrow as partial compensation for

their damages.  The attorney demanded that the earnest money be sent to him as soon as possible.  Furthermore, the attorney stated, "Please be advised that your payment of the earnest money in any manner other than as set forth above will be considered a breach of your duties as escrow agent, and we will hold you responsible for any such breach."

Sheaffer responded to the letter by calling the Wentzes' attorney and informing him that he had returned the earnest money to Lu and that he did so pursuant to the failure-to-repair cancellation provision in the addendum.  On October 10, 1994, Sheaffer received another letter from the Wentzes' attorney stating that Sheaffer neglected to comply with a provision contained in the primary contract in disbursing the funds to Lu.  That provision reads as follows:

"EARNEST MONEY DEFAULT.  Upon presentation of this offer, Purchaser has delivered to Majestic Investments [written in], broker, the sum of $2,000.00 [written in] as earnest money, to be (1) deposited in the Broker's trust account promptly after acceptance of this offer or (2) returned to Purchaser upon request if this offer is not accepted.  The earnest money shall be paid to Purchaser or applied on the purchase price at closing.  If the closing does not occur because of Seller's default or because any condition of this contract is not satisfied or waived, Purchaser shall be entitled to the earnest money.  If Purchaser defaults, Seller shall be entitled to the earnest money.  The parties acknowledge, however, that the Broker will not make a determination as to which party is entitled to earnest money.  Instead, the Broker shall release the earnest money from the trust account only (a) in accordance with the joint written instructions of Seller and Purchaser, or (b) in accordance with the following procedure: if the closing does not occur for any reason (including the default of either party), the Broker holding the earnest money may notify Seller in writing that the earnest money will be returned to Purchaser unless Seller makes a written demand for the earnest money within 20 days after the date of the Broker's notice.  If the Broker does not receive a written demand from the Seller within the 20 day period, the Broker shall return the earnest money to Purchaser.  If a written demand from Seller is received by the Broker within the 20 day period, the Broker shall retain the earnest money until i) Seller and purchaser have settled the dispute; ii) disposition has been ordered by a final court order;  or iii) the Broker deposits the earnest money with the court pursuant to applicable court procedures.  Payment or refund of the earnest money shall not prejudice the rights of the Broker(s) or the nondefaulting party in an action for damages or specific performance against the defaulting party."

The Wentzes' attorney contended that Sheaffer was required to, but failed to, comply with these procedures.  In particular, the attorney asserted that Sheaffer was required to allow the Wentzes twenty days to object to the return of the

earnest money to Lu and Gao. The Wentzes' attorney further contended that because Sheaffer's release of the money to Lu was improper, Sheaffer was indebted to the Wentzes for the $2,000 plus ten percent interest.

At some point after Sheaffer returned the money to Lu, Sheaffer contacted the Dayton Area Board of Relators ("board") to inform them that he believed the provision concerning earnest money in the primary contract was inconsistent with the provision contained in the addendum. Sheaffer told the board that he believed that no matter which provision he followed he would have been sued and either way he could have been breaching a fiduciary duty. Sheaffer requested that the board clarify the language of the contract to ensure that no one else would be caught in the same "catch 22." Several months later, Sheaffer received a letter from the board informing him that, although it did not agree with his interpretation of the addendum provision, it had reworded it to avoid the possibility of the same misinterpretation in the future. The revised provision reads that in the event that the purchaser cancels the contract because the seller is unwilling or unable to repair a defect, "the earnest money shall be returned to Purchaser in accordance with the procedures set forth in paragraph 10 on the first page of this Contract * * *."

After Sheaffer refused to deliver the $2,000 plus interest to the Wentzes, they filed a formal complaint against Sheaffer with the Ohio Department of Commerce, Division of Real Estate ("DRE"). The complaint alleged that Sheaffer breached his fiduciary duty to the Wentzes when he returned the earnest money to Lu and Gao in a manner inconsistent with the terms of the earnest money default clause contained in the primary purchase contract.

On June 30, 1995, a DRE hearing officer conducted a formal hearing on the allegations in the Wentzes' complaint. The Wentzes, Sheaffer, and Kenneth Strahler testified and were cross-examined at the hearing. On July 18, 1995, the hearing officer set forth the following findings of fact and conclusions of law:

"1.   Respondent [Sheaffer] is the supervising broker for the Majestic Investment Real Estate, Inc., brokerage located at 3355 Dayton–Xenia Road, Dayton, Ohio 45432.

"2.   This case involves the brokerage's sponsorship of a sales agreement for property located at 3834 Westwind Drive, Beavercreek. This property had been listed by agent Leslie Draeger of Residenz Realty. Mr. and Mrs. William H. Wentz, III, the complainants, were the owners of the property being offered for sale.

"3.   Mr. Ken Strahler, an affiliated salesperson of respondent's Majestic brokerage, did assist in bringing Dr. Guozhen Lu and Meiling [G]ao to subject property and in the sponsoring a purchase contract issued on their behalf. In his

position in the transaction, Mr. Strahler had established himself and Majestic brokerage as legally representing the buyers in the transaction. (Respondent's Exhibit # 7).

"4. The primary contract document was approved by the parties on July 7, 1994 (hereinafter referred to as the 'Contact.' [*Sic.*]) This agreement specified a $217,500.00 sales price. It was a form-type agreement sponsored by the Dayton Board of Realtors.

"5. Since $2,000.00 was taken by Strahler and placed in the Majestic trust account, paragraph fourteen of the contract form agreement entitled 'Earnest Money: Default' was the primary relevant provision regarding the eventual disposition of the earnest money.

"* * *

"6. But in addition to the primary agreement, the parties simultaneously approved a separate inspection 'addendum.' * * * In the addendum, the buyers opted to have the privilege to inspect several systems and conditions in the house. Radon levels were one of the conditions to be checked. The inspections were to be done by properly certified professionals. The inspection form was sponsored on a Dayton Board of Realtors form document. There was a specific contract provision specifying what was to occur in the event of discovery by inspection of a defect.

"That provision reads as follows:

" '3. Right to Cancel. If a seller is unwilling or unable to repair any defect or to provide the assurance described above during the Repair Period, purchaser shall have the right, at purchaser's sole option, to cancel this Contract, in which event the earnest money shall be returned to purchaser and the parties shall be released from all further obligations under this contract. * * *'

"7. By July 27, 1994, most of the inspection categories had been resolved. However, two sticky issues remained in dispute, i.e., the condition of the furnace, and the appropriate interior radon gas to which the home was to be remediated. Eventually, the parties reached an understanding as to correcting the furnace defects. Still, no understanding was reached regarding what level of radon gas was necessary to achieve to improve from the existing 7.0 picocurie/liter level 'pc/I.' The buyers originally sought the level 1.2 pc/I [*sic* 1.3] which they contend was the national radon average established by the EPA.

"8. The complainants, according to its contractual rights to pursue correction of the defect, contacted several radon remediation companies. Based upon these evaluations, they concluded that the lowest realistically achievable level was 4.0 pc/I. They issued in a writing a pledge to the purchasers to correct to that level

and to assume all the expenses to accomplish this. The sellers [*sic*] demanded more.

"9. Respondent participated in a last resort session with the parties to attempt to bring this remaining issue to an amicable conclusion to allow the contract to proceed. The complainants pledged to correct the radon level to 4.0 pc/I. The purchasers, acting through their own agent, testified they researched the issue of whether 4.0 pc/I was in fact the lowest achievable level in mitigation. They claim to have found a reputable company that could guarantee a level of 2.0 pc/I for about $1,200.00, approximately twice the amount the sellers wanted to spend. The purchasers indicated that only a 2.0 pc/I would be acceptable to them. This was a value considerably lower than the complainants were willing to accept in light of their belief that 4.0 pc/I was [a] reading well within safe ranges of radon presence and was reasonable to implement cost-wise. The complainants also contended that the basis of the purchaser's decision to have a 1.3 pc/I level achieved was not communicated to them. They claimed any average established nationally was irrelevant and they did not know of any realistic quote to reach the 2.0 pc/I level.

"[10.] After an impasse developed respondent testified Mr. Lu and Ms. Gao demanded of him that their entire earnest money deposit be immediately returned to them involving the Addendum's paragraph three, the 'Right to Cancel' provision. Their position was [that] according to that section the sellers were in breach because of their unwillingness to correct the radon defect.

"11. Respondent credibly testified that despite the language in the sales agreement that a notice procedure had to be followed or a release of the parties had to be obtained before the disbursement of the deposit he said that he had to consider as a competing duty also as a mandate to him under the inspection addendum requiring the deposit be returned to the purchasers because they invoked the contract cancellation provision. Respondent contends that preprinted language in the two documents may have set up inconsistent duties. That form language was drafted [*sic*] sponsored by the Dayton Board of Realtors.

"12. Respondent proposed a release form to the complainants which indicated the $2,000.00 would be returned to the purchasers. Th ، complainants objected and would not sign the proposed release.

"13. Believing he had the authority to do, and acting under a claimed mandate derived from the inspection addendum, respondent on July 28, 1994, returned the entire $2,000.00 deposit to the purchasers.

"14. On August 8, 1994, unbeknownst to the complainants that the funds were returned, the complainants indicated in a letter to respondent that the purchasers were the party in default and, consequently, the $2,000.00 should be remitted to

complainant[s]. They then learned of the prior disbursement of the funds. Complainants obtained an attorney who claimed that respondent's actions in returning the entire deposit was [*sic*] improper.

## "CONCLUSIONS OF LAW

"1. The transactional contract stipulations regarding procedures for disbursement of earnest money and the specific conditions for contract cancellation set forth in the inspection addendum relative to the attempted sale of the Westwind property is [*sic*] to be viewed and interpreted in light of the standards regarding deposit disbursements judicially imposed by the Supreme Court in its *Kiko* decision (48 Ohio St.3d 74 [549 N.E.2d 509] (1990)), and as best as any competing language can be reconciled. Conventional legal duties regarding the deposit may to some degree have been altered by mutually agreed terms in the contract of the parties.

"2. Initially, it must be recognized that on the issue of radon remediation and the inspection contingency concurrent positions of the parties both were grounded in reason. While the appropriate conduct of the parties might be measured by a 'good faith' standard, the addendum was also patently clear as to how an automatic breach by a party is ascertained. While complainants argued that 4.0 pc/I was achievable, the buyers offered only to accept a remediation level of 2.0 pc/I following an original demand of 1.3 pc/I and produced evidence that [it] could be done. In the absolutism [*sic*] language of the addendum, the contract arguably became unilaterally voidable at the purchasers' option.

"3. According to the *Kiko* decision, brokers should resist making legal determinations regarding disputes and seek a mutually acceptable settlement by the parties. However, in the documentary contest of this case, either retention or disbursement of the earnest money would reflect a legal determination by the broker as to whether beach [*sic*] [had] occurred, which would be contrary to the authorities set out in the addendum.

"4. Respondent made a valid point to the examiner [that] the faulty language was not his and created a direct contractual linchpin to the purchasers to assert rights for immediate return of the deposit. His contention was that only by his immediate return of the $2,000.00 could those direct claims of his legal client be fulfilled.

"5. While Respondent did sponsor the transactional language, he was not the author. He could have simply avoided any problem in the conflict by assuming responsibility at the outset by advancing the $2,000.00 to the purchasers on a conditional basis, retaining the separate original $2,000.00 in trust in respect of the demands of complainants that might be raised. Later, if the language were

determined to be inherently defective, responsibility for the documentary language potentially might be transferred to the Dayton Board allowing respondent to recoup his losses.

"6. Respondent is deemed to have been responsible for any rightful claims of the complainants that ultimately might be established (by judicial action or consent) regarding the deposit. This is because respondent cannot argue that if the complainants hereinafter establish some right to any portion of the deposit that they also breached the contract pursuant to the inspection conditions which respondent relies upon to return the deposit.

"7. The bottom line is that since this examiner believes respondent returned the purchasers [sic] deposit to satisfy a direct contract cancellation duty arising from the inspection contingency, no license law violation is deemed to have occurred. Nonetheless, the ultimate contractual rights of the parties remains [sic] to be established and respondent remains subject and liable to any adverse succeeding action, should it occur.

"8. In conclusion, because he acted under an impression he had a contractual obligation to return the purchasers' deposit, it is deemed that respondent did not violate Section 4735.18(A)(6) of the Revised Code. This conclusion should not be construed as a declaration that the complainants breached the contract because of the radon issue or that their rights to claim all or part of the earnest deposit have been terminated. On the contrary, these rights to pursue such claims subsist. Because of the transaction language and his choice to return the deposit, respondent should remain secondarily liable for sellers' claims against the purchasers if they should subsequently be validated."

The hearing officer then put forth the following recommendation:

## "RECOMMENDATION OF ACTION

"1. With respect to the charges set forth in 'Schedule A' of the charge letter, respecting respondent's alleged improper return of the deposit without a prior mutual release of the parties, respondent is deemed not to have violated Section 4735.18(A)(6) because he honestly and reasonably believed [that he was] bound by a competing obligation to the purchasers to automatically return the deposit pursuant to language in the inspection addendum."

On August 30, 1995, the DRE held a meeting to consider the hearing officer's recommendations. On September 5, 1995, the DRE issued its decision. The DRE adopted the hearing officer's findings of fact in their entirety, but only adopted portions of the hearing officer's conclusions of law. The DRE specifically rejected the hearing officer's conclusions of law 3, 7, and 8.

As to conclusion of law 3, the DRE found that retention of the earnest money in a trust account would not have amounted to a legal determination by Sheaffer. The DRE stated, "To maintain the status quo of funds held on deposit reflects a neutral position of the fiduciary awaiting ambiguous instructions." Ohio Real Estate Commission, August 30, 1995 Meeting, at 10. The DRE based its decision on the court's pronouncement in *Richard T. Kiko Agency, Inc. v. Ohio Dept. of Commerce, Div. of Real Estate* (1990), 48 Ohio St.3d 74, 549 N.E.2d 509, that when there is a conflict over who is entitled to the earnest money, the dispute must either be mutually resolved or decided by a court of competent jurisdiction. The DRE found that since Sheaffer, rather than the parties or a court, decided who was entitled to the money, Sheaffer's action was improper under *Kiko*. With regard to conclusion of law 7, the DRE decided that Sheaffer, who was not a party to the contract, was bound by his fiduciary duties rather than a speculative duty under the failure-to-repair cancellation clause. As to conclusion of law 8, the DRE found that the hearing officer misapplied the law to the facts. The DRE further declared that any "interpretation of the terms of a contract by a licensee which results in the release of an earnest money deposit is misconduct and a violation of Ohio Revised Code Section 4735.18(A)(6)." The DRE then suspended Sheaffer's real estate license for thirty days.

On September 25, 1995, Sheaffer appealed the decision of the DRE to the Montgomery County Court of Common Pleas. The common pleas court affirmed the DRE's decision. The court held that the DRE's decision was not contrary to law. The court decided that the DRE's decision was not contrary to law because the court determined that a real estate broker should remain neutral whenever there is a conflict over earnest money. The court further found that the contract in this case clearly delineated the procedure to be used when the ownership to earnest money is in dispute. The court concluded that Sheaffer failed to abide by that contractual procedure and in doing so violated his duties under the purchase contract.

Next, the court considered whether the DRE's decision that Sheaffer was guilty of misconduct was supported by reliable, probative, and substantial evidence. The court judged that the DRE correctly determined that the return of the earnest money constituted misconduct under R.C. 4735.18(A). The court found that the return of the earnest money was willful improper behavior. Furthermore, the court discerned that willful improper behavior was sufficient to establish misconduct in view of the Supreme Court's holding in *Kiko, supra,* that misconduct does not necessarily entail dishonesty or bad faith.

Finally, the court addressed whether the penalty of a thirty-day license suspension was supported by reliable, probative, and substantial evidence. The court held that common pleas courts retain no jurisdiction to modify a penalty

imposed by the DRE on the basis that the penalty alone was an abuse of discretion. The court stated that a common pleas court may only adjust a penalty imposed by the DRE when the court overrules a portion of the basis of the penalty. Finding that the court did not find any substantive basis to overrule the DRE's decision, the court adjudged that it was without authority to modify the penalty. Sheaffer now brings this timely appeal of the common pleas court's judgment.

In his sole assignment of error, Sheaffer argues:

"It was error for the lower court to affirm the finding of the Real Estate Commission's thirty-(30) day suspension and the commission's finding that the appellant committed misconduct in that said affirmation was not supported by reliable, probative or substantial evidence, and that said affirmation was contrary to law."

## A

Sheaffer first argues that his return of the earnest money did not amount to "misconduct" under R.C. 4735.18. R.C. 4735.18 provides, in relevant part:

" * * * [T]he Ohio real estate commission shall suspend or revoke the license of any licensee who * * * is found to been convicted of a felony or a crime of moral turpitude, and shall suspend or revoke the license of any licensee who, in his capacity as a real estate broker or salesman, or limited real estate broker or salesman, or in handling his own property, is found guilty of:

" * * *

"(6) Dishonest or illegal dealing, gross negligence, incompetency, or *misconduct*[.]" (Emphasis added.)

The Ohio Supreme Court held in *Kiko, supra,* that the DRE is empowered to determine whether acts of a broker constitute "misconduct" within the meaning of the statute. Additionally, the court set forth the standard for determining which acts constitute "misconduct." The court announced that "misconduct" includes unprofessional conduct, conduct involving a breach of a mandatory duty under the professional code of ethics, and conduct that is contrary to law. The court also observed that considerations of the licensee's willfulness or good intentions and whether one suffered an actual harm are not necessarily controlling factors in determining whether misconduct has taken place.

An administrative licensing board has the authority in a disciplinary action to rely upon its own expertise in deciding whether a real estate broker has failed to conform to a minimum standard of practice. *Vradenburg v. Ohio Real Estate Comm.* (1982), 8 Ohio App.3d 102, 8 OBR 136, 456 N.E.2d 573. Hence, an administrative licensing board must be given considerable discretion in a license

suspension or revocation hearing in determining whether certain conduct is violative of a set standard of practice in the industry. *Id.* at 104, 8 OBR at 138–139, 456 N.E.2d at 575–576. Our standard of review is whether the DRE's finding of misconduct is supported by reliable, probative, and substantial evidence and is in accordance with the law. *Hughes v. Ohio Div. of Real Estate* (1993), 86 Ohio App.3d 757, 621 N.E.2d 1249.

We find no error in the trial court's decision to affirm the DRE's order. When a broker agrees to accept responsibility for earnest money, certain duties are conferred upon the broker in terms of the broker's management and disbursement of the funds. The broker owes these duties to both the purchaser and seller. Some of the broker's duties are based in the purchase contract while other duties arise out of the fiduciary relationship that the broker is placed in with respect to the purchaser and seller. Brokers who have been entrusted with earnest money have a fiduciary duty to remain the neutral agent of both parties even though the broker may also be the agent of one of the parties in the underlying transaction. Because the broker is to remain impartial with regard to the earnest money, the broker may not act contrary to the rights or interests of one of the parties in the earnest money.

In the present case, Sheaffer did act adversely to the Wentzes' rights. Sheaffer recognized a possible conflict between his duties as outlined in the primary contract and the addendum. According to the primary contract, the Wentzes' were entitled to notice of the proposed release of the escrow money and twenty days to object. On the other hand, the addendum seemed to direct the immediate release of the earnest money without any notification, consent, or release requirements. In view of this apparent contractual conflict, Sheaffer had a fiduciary duty to remain neutral, and not to act contrary to the Wentzes' interests, until a resolution of this perceived conflict could be achieved. Instead, however, Sheaffer followed the addendum provision because he believed that he had a direct contractual duty under the provision to return the money. In doing so, Sheaffer violated his fiduciary duty by compromising any possible rights and interests the Wentzes' had under the primary contract provision.

Our finding that Sheaffer acted in dereliction of his fiduciary duty not to behave antithetically to the interests or rights of one of the parties does not conclude our consideration. It is also necessary for us to reflect upon whether a breach of a fiduciary duty is tantamount to "misconduct." We look to the Supreme Court's holding in *Kiko* for guidance on this matter. In *Kiko*, the court grounded its affirmance of the DRE's finding of misconduct partially on its observation that the licensee had betrayed a fiduciary duty contained in one of the real estate ethical canons. The fiduciary duty was not explicitly given expression to in the canon. Nevertheless, the court was confident that the responsibilities described in the canon necessitated a relationship of trust and

confidence. This relationship, the court apparently believed, implicated a licensee's fiduciary obligations. Specifically, the court recognized that the licensee had an unwritten fiduciary duty not to deliver earnest funds until the licensee had procured the consent of both parties. The court signaled that a breach of this fiduciary duty was independently adequate to support a finding of misconduct. In our view, the court's construction of the term "misconduct" in *Kiko* was not circumscribed to solely a violation of that particular fiduciary duty, but was intended to subsume conduct in violence of any fiduciary duty conferred upon a licensee.

Turning to the present case, Sheaffer abandoned his fiduciary duty not to act adversely to the interests or rights of one or both of the parties. Thus, according to *Kiko*, Sheaffer's conduct was a sufficient basis upon which the DRE could have rested its finding of misconduct. We further apprehend that our decision is not crippled by Sheaffer's assertion that he was placed in a double bind by the possible incompatibility of the provisions and that either course of action would have ended in a lawsuit. While we concede that brokers holding earnest money must comply with their duties arising under contract, absent from Sheaffer's argument is an understanding that brokers must exercise those contractual duties within the context of their fiduciary duties. If Sheaffer would have comprehended the interrelationship of these duties, his course of action would have been obvious to him. Although Lu may have sued Sheaffer for breach of his supposed duty under the addendum, Sheaffer would have been impervious to liability because he merely adopted a neutral stance until his duties could be clarified. The inevitable consequence of a neutral position is that one of the parties may not be entitled to immediate action according to the provision that he or she believes is controlling. This unavoidable offshoot of neutrality, however, does not convert a neutral position into a biased one. We find this argument to be devoid of merit.

## B

■ Next, Sheaffer asserts that his penalty was disproportionate to his misconduct. While we might be sympathetic to Sheaffer's argument, we are unable modify the DRE's penalty. A reviewing court is bereft of the power to modify a penalty that the DRE was authorized to impose. *Henry's Cafe, Inc. v. Ohio Bd. of Liquor Control* (1959), 170 Ohio St. 233, 10 O.O.2d 177, 163 N.E.2d 678. Because we did not find any mistake in the DRE's finding of misconduct, we are unable to review the reasonableness of the penalty.

*Judgment affirmed.*

BROGAN, P.J., and FAIN, J., concur.